**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-236 (ACR)** |
| | : | |
| | : | |
| **RANDOLPH TYSON MILLINER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Randolph Tyson Milliner has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Milliner to 14 days of incarceration and 36 months of probation. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.      **Introduction**

Defendant Randolph Tyson Milliner, a 49-year-old computer network technician and a former member of the U.S. Army, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Milliner, a resident of South Carolina, drove from Greer, South Carolina, to the Washington, D.C. area on January 5, 2021.  On January 6th, at about 2:50 P.M., Milliner illegally entered the United States Capitol building through a broken window adjacent to the Senate Wing Door and joined the dense crowd already inside.  After surveying the chaos for a few minutes, he moved deeper into the building, proceeding to the Crypt, and the Small Rotunda, and the Hall of Columns.  He left the building through the South Doors, but he did not leave the premises.  He remained on an exterior terrace of the building until at least 4:10 P.M.  While on the terrace, he used his phone to take videos and send messages on social media.  The next day, in a chat conversation on Discord, he confirmed his support for the riot.  He stated, "Like I'm glad our reps were sent a message" and "Yup, folks armed with no more than sticks and flags backed down cops in full riot gear armed with cs gas and pepper spray and flash bangs."

Milliner pled guilty by Information to violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  The government's recommendation is supported by Millner's entry into the Capitol building via a broken window, his callous disregard for the gravity of what was happening around him, and his express approval of the larger aims of the mob.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Here, the facts and circumstances of Milliner's crimes support a sentence of 14 days of incarceration, 36 months of probation, and 60 hours of community service in this case.[2]

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol in the Statement of Offense. *See* ECF No. 6 at ¶¶ 1-7.

### Defendant Milliner's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Randolph Tyson Milliner drove alone from his hometown of Greer, South Carolina to a hotel in Fairfax, Virginia. Very early the next morning, he used Uber and Metro services to go the United States Capitol. He was in the vicinity of the Washington Monument before 8:00 A.M., and he attended former President Trump's "Stop the Steal" rally at the Ellipse.

He later marched with other rioters to the Capitol. Once there, he ascended to the Upper West Terrace by the steps on the left side of some scaffolding. Milliner suggested in a Facebook message to another individual that he considered climbing the scaffolding but decided not to because there were a lot of people already on it, and he wasn't sure if it could hold the weight.

---

[2] When a court intends to impose both incarceration and probation, these sanctions must be imposed on different counts. *See United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023).

At 2:50 P.M., shortly after a violent breach at the Senate Wing Door, Milliner entered the Capitol building by climbing through a broken window adjacent to the Door and joined the dense crowd already inside the foyer.  *See* Image 1.



*Image 1 –Milliner (framed in red) immediately after hopping down from window adjacent to Senate Wing Door.[3]*

Milliner watched as other rioters waved flags and loudly chanted, "Trait-ors!", targeting nearby police officers who stood helplessly near the back wall.  *See* Image 2.

---

[3] Image 1 is a screenshot from CCTV monitoring video at :01.



*Image 2 - Milliner (framed in red) in foyer by Senate Wing doors.[4]*

After spending some minutes in the foyer, he proceeded to the Crypt and the Small Rotunda. Surveillance video shows Milliner carrying a water bottle and using his phone to make video recordings. He walked down several hallways, including the Hall of Columns. *See* Image 3.

---

[4] Image 2 is a screenshot from a lengthy live-streamed video taken by a rioter named BakedAlaska.at 4 minutes and 45 seconds.



*Image 3 – CCTV showing Milliner (framed in red) with water bottle walking through a hallway.[5]*

He exited the South Doors at 3:02 P.M., only two and a half minutes after a rioter who was shot was rolled out on a stretcher.  In doing so, he seems not to notice that he is walking alongside an uninterrupted trail of blood on the white marble floor.  *See* Image 4.

---

[5] Image 3 is a screenshot from CCTV monitoring video at :11.



*Image 4 – Milliner passing metal detector at end of Hall of Columns close to South Door exit
(Milliner outlined in red; blood trail visible within yellow frame)[6]*

In total, he was inside the U.S. Capitol building for approximately 12 minutes.  After
exiting, Milliner remained on an exterior terrace of the building over an hour, until at least 4:10
P.M.  He can be seen leaning against the stone balustrade surrounding the terrace and looking at
his phone.  *See* Images 5, 6, and 7.

---

[6] Image 4 is a screenshot from CCTV monitoring video at 3 minutes and 53 seconds.



*Image 5 – Milliner leaning against terrace balustrade.*[7]

---

[7] Images 5, 6, and 7 are multiple screenshots from open-source video taken by another rioter on the elevated terrace.

 

*Image 6, Image 7  – Milliner on terrace using phone.*

While on the terrace, at approximately 3:15 P.M., Milliner used his phone to access and communicate via the social media platforms, Facebook Messenger, Google Chat, and Discord,[8] and to share pictures he had taken during the riot.  Based on available chat conversations, Milliner appears to have been replying to inquiries about where he was and whether he was inside the Capitol building.

Milliner continued to communicate about the riot after January 6, 2021.  In a conversation on Discord on the evening of January 7th, Milliner, who was corresponding as "Archellion," made the following statements to another user:

---

[8] Discord is a VoIP, instant messaging, and digital distribution platform.  Users can communicate with voice calls, video calls, text messaging, media and files in private chats or as part of communities called "servers."  A server is a collection of persistent chat rooms and voice chat channels which can be accessed via invite links.

**[….] Like I'm glad our reps were sent a message**

Later in the conversation, he stated,

**Yup, folks armed with no more than sticks and flags backed down cops in full riot gear armed with cs gas and pepper spray and flash bangs.**

**and then didn't burn anything down**

On January 9th, he had a conversation with another Facebook user in which he said, in three sequential messages,

**I did find it encouraging that the Pentagon rebuffed Nancy Pelosi's invitation to overthrow the President via military coup**

**It seems like all the politicians are our enemies, but maybe most of the military is still a reliable ally**

**It's in God's hands now.  I think we, as citizens, have done all we can do for the time being.**

Later in the same conversation, he stated,

**I'm firmly fixed in my opinion that our government is not longer deriving its power through the consent of the governed.**

Milliner referred to January 6, 2021 as "an historic day."

Despite these statements, Milliner seemingly realized that his conduct was criminal.  For about a week, beginning January 10th, he searched the web for information about criminal culpability for those who took part in the riots.  The websites he visited included one hosted by the Department of Justice which features a list of individuals charged with criminal offenses from January 6, 2021 events, along with information about their charges and links to charging documents.  He conducted various searches, including for the phrases, "u.s. capitol facial recognition" and "expungement attorney."  On January 17th, he viewed multiple videos uploaded to Youtube featuring locations inside the Capitol building where he is known to have been present.

It is likely that that he was trying to find himself in video footage of the riot that had been posted to social media.

Agent review of Milliner's publicly viewable Facebook account revealed a large span of time before, including, and after January 6th (i.e., from October of 2020 to March of 2021) during which there were no posts, which was inconsistent with Milliner's prior and subsequent posting history and habits.  It appears that Milliner, concerned about possibly being investigated for his conduct on January 6th, deleted a large number of posts and other information from his Facebook account to prevent detection by law enforcement.

*The Charges and Plea Agreement*

On May 15, 2024, the United States charged Milliner by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  On June 28, 2024, pursuant to a plea agreement, Milliner pleaded guilty to both counts of the Information.  By plea agreement, Milliner agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Milliner now faces sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Milliner faces up to six months of imprisonment and a fine of up to $5,000.  He must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' incarceration, 36 months' probation, and 60 hours of community service.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Milliner's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Milliner, the absence of violent or destructive acts is not a mitigating factor.  Had Milliner engaged in such conduct, he would have faced additional criminal charges.

Milliner entered the United States Capitol building by climbing through a broken window. Despite clear evidence that a violent riot was taking place, he chose to be part of the fray, to be part of what the mob was doing, to join in the effort to occupy the building by force.  His choice reflects his support for one of the mob's objectives – the terrorization and intimidation of members of Congress who were meeting in session to certify the electoral vote.  Because of the physical presence of thousands of individual rioters like Milliner streaming in from every opening, police officers inside the Capitol building were helpless to stop the desecration and disruption that ensued.

Milliner expressed his support for that goal even in the aftermath of the riot, saying that "I'm glad our reps were sent a message."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Milliner's History and Characteristics

Milliner reported to the PSR writer that he enlisted in the U.S. Army infantry from 2000 to 2001. There is no information as to the circumstances of his discharge, nor is there any information as to whether his military service included active duty.

While Milliner's military service may be laudable, it renders his conduct on January 6th all the more troubling. As a former member of the military, Milliner was well-aware of the importance of following the law and not entering restricted government buildings. His voluntary decision to storm a guarded government building which is symbolic of our democracy in the midst of a riot is disturbing. One would have expected someone with Milliner's military background to have had more respect for the sacred integrity of our democratic institutions. The fact that he did not weighs in favor of a sentence of incarceration.

Milliner accepted responsibility for his conduct by pleading to an Information. He continues to be employed as a computer network technician. He has been compliant with the conditions of pre-trial release, and he has no criminal record.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

13

political protest, simply an episode of trespassing in a federal building.  What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred."  (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.[9]

---

[9] See *United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to

*Specific Deterrence*

A two-week term of incarceration is warranted in this case, for two reasons.

First, Milliner's post-January 6th statements reflect a fundamental inability to recognize that political violence is unacceptable, and that the riot was an unprecedented attempt to disrupt the peaceful transition of power.  He said that he was "glad our reps were sent a message," even as he acknowledged that the rioters did so illegally by "back[ing] down cops in full riot gear."  He also expressed his view that the government is "no longer deriving its power from the consent of the governed."  While Milliner is entitled to hold whatever political beliefs he wishes, his statements show a startling lack of respect for the democratic process, for the views of his fellow citizens, and for the avenues available for all Americans to legally make their voice heard through their elected representatives.  A sentence of incarceration is necessary to deter Milliner from engaging in similar conduct in the future and weighs in favor of a sentence of incarceration.

Furthermore, although Milliner accepted responsibility by stipulating to all of the facts underlying his guilt, he has not expressed any remorse regarding his conduct and statements relating to January 6th.  By the evening of January 7th, he would most likely have seen and heard coverage on news media about the violence that occurred at the Capitol.  But he did not condemn this violence or express regret about having been part of the mob.  On the contrary, his post-riot statements seem to betray a personal pride in having participated in the events of January 6th.  He expressed satisfaction and approval with the fact that, in a violent clash between rioters and police, the rioters had prevailed.  His word choice of the word, "armed", in describing what the "folks" had in contrast with what the "cops" had betrays his view of what happened on January 6th as a

---

improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

violent confrontation.  Despite having had the opportunity to do so at several junctures, he has failed to express any remorse for his conduct or to acknowledge the ways that the violent mob terrorized members of Congress and their staff.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[10]  This Court must sentence Milliner based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Milliner has pleaded guilty to both Counts of the Information, charging him with 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  These offenses are Class B misdemeanors.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."  The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Stephanie Miller*, Case No. 21-cr-266 (TSC).  Just like Milliner, Stephanie Miller and her husband, Brandon Miller, entered the U.S. Capitol building through a broken window by the Senate Wing Door.  After entering at 2:56 PM, they lingered in the foyer for some minutes, then proceeded to the Crypt.  Her husband, Brandon, live-streamed a video on Facebook and made a few celebratory statements about having gained entrance into to the building.  Like Milliner, they exited by the Hall of Columns.  They were inside the building for approximately 11 minutes.  Also similar to Milliner, Stephanie Miller posted private Facebook messages to other users expressing pride in having participated in the riot, and about having enjoyed the experience.  Her messages acknowledged the possibility of criminal liability.  They showed a failure to recognize the gravity of the riot and her conduct therein.  They also showed a lack of remorse.  She was convicted of one count of 40 U.S.C. § 5104(e)(2)(G).  The Court imposed a sentence of 14 days of incarceration and 60 hours of community service.

*United States v. Richard Watrous*, Case No. 21-cr-627 (BAH).  Watrous entered the U.S. Capitol building at around the same time as Milliner, at 2:48 P.M.  He entered via the Upper House Door.  While he was inside, he took pictures and videos.  After witnessing other rioters physically and verbally attack police officers in a hallway, he decided to leave the building and did so at 2:53 P.M.  Similar to Milliner, Watrous remained for a while after exiting.  He stayed on the steps outside the Upper House Door for about 15 minutes.  In a voluntary interview with Agents, he admitted having briefly re-entered the building at the Rotunda, but there was no video evidence of it.  He told the Probation Officer he regretted going to the Capitol and breaking the law.  Watrous

was convicted of one count of 40 U.S.C. § 5104(e)(2)(G).  The Court imposed a sentence of 14 days of incarceration, 60 days of home detention, and 36 months of probation.

*United States v. Mark Nealy* , Case No. 23-cr-278 (TSC).  Nealy, 52, entered the U.S. Capitol building at the Senate Wing Door at 2:25 P.M., just 12 minutes after the initial violent breach.  He walked to the Crypt, used a restroom in the elevator lobby, and ultimately exited via the same doors at 2:38 P.M.  He was convicted of one count of 40 U.S.C. § 5104(e)(2)(G).  The Court imposed a sentence of 14 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[11]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Milliner must pay $500 in restitution, which reflects in part the role Milliner played in the riot on January 6.[12]  Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023."  *Id.*  (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)  Milliner's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  *See* PSR ¶ 80.

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[12] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI.     Fine

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G) subject him to a statutory maximum fine of $5,000.  *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *see also* U.S.S.G. § 5E1.2(d).

The burden is on the defendant to show present and prospective inability to pay a fine.  *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in 18 U.S.C. § 3572(a), this Court may impose a fine.[13]  His convictions under 40 U.S.C. Section 5104 subject him to a maximum fine of $5,000.  *See* 18 U.S.C. § 3571(b)(6).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Milliner to 14 days of incarceration and 36 months of probation.  The government also requests that this Court impose 60 hours of community service.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Milliner's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[13] The Probation Officer found that Milliner "may be able to pay a fine."  P.S.R. ¶ 61.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BY:     /s/   David J. Perri

DAVID J. PERRI
WV Bar No. 9219
Assistant United States Attorney (Detailed)
United States Attorney's Office